# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN

**JAY BROWN,**

      Plaintiff, on behalf of himself and
other persons similarly situated

v

**AJAX PAVING INDUSTRIES, INC,
a foreign corporation,
AMERICAN CONTRACTORS
INSURANCE GROUP, INC, a foreign
corporation, WARD NORTH AMERICA, LP,
a foreign corporation or limited partnership,
VERICLAIMS, INC, a foreign corporation,
NOVAPRO RISK SOLUTIONS, LP,
NOVAPRO US RISK, LLC,
foreign corporations or other legal entity,
and DR. PAUL DROUILLARD,
Jointly and Severally,**

      Defendants.

> There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

---

**MARSHALL LASSER P25573
MARSHALL LASSER, P.C.**
Attorney for Plaintiff
po box 2579
Southfield MI 48037
248-647-7722
mlasserlaw@aol.com
ddtalon@gmail.com

---

## CIVIL RICO COMPLAINT AND JURY DEMAND, AND REQUEST FOR CLASS CERTIFICATION

### JURISDICTION AND VENUE

1.     Federal question jurisdiction is conferred by plaintiffs' claims under the Federal

Racketeer Influence and Corrupt Organizations Act, 18 USC §1961 et seq (RICO).   Diversity of

citizenship jurisdiction is conferred by 28 USC §1332 (plaintiffs are citizens of Michigan, defendants except Dr. Drouillard are citizens of other states, and the amounts in controversy exceed $75,000).      2.      Venue is properly laid in the Federal District Court for the Eastern District of Michigan because plaintiffs reside in that district and defendants do business in person and through their agents and representatives in that district, in Wayne, Macomb and Oakland Counties, Michigan.

3.  The predicate acts complained of herein involve interstate commerce and the inter and intrastate use of the United States mails and electronic communications, and mail and wire fraud in violation of 18 USC 1341 and 1343.

PARTIES

4.  Plaintiff Jay Brown resides within the jurisdiction of this district court.  He was an employee of Ajax Paving Industries.   Ajax's Michigan workers compensation insurance was provided by American Contractors Insurance Group, Inc (ACIG), a foreign corporation, and the workers compensation insurance program was adjusted by Vericlaims, Inc, a foreign corporation, and Ward North America, LP, a limited partnership or corporation which may have been succeeded by (and liabilities assumed by) either NovaPro Risk Solutions LP or NovaPro Risk US LLC., corporations or legal entities domiciled outside Michigan.  Dr. Paul Drouillard resides in Michigan, with a principal place of business in Wayne County.

5.      This case arises under the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. 1961 through 1968.

6.      Ajax employed plaintiff 2005.   It complied with its obligation to provide its

2

Michigan employees Michigan workers disability compensation insurance by signing a contract of insurance with ACIG; ACIG and or Ajax contracted with Ward North America and Vericlaims for administration of work compensation claims.    Ward and Vericlaims were TPAs (third party administrators of workers compensation claims).

7.    Ward North America adjusted the Michigan workers compensation claims out of an office in or near Wyandotte, MI.   Ward's successor, NovaPro Risk Solutions or NovaPro Risk, adjusted claims out of offices outside Michigan; Vericlaims adjusted claims from an office outside Michigan.

8.    Decisions regarding paying or denying Michigan workers compensation claims, and selecting doctors to do medical examinations of claimants, were made by defendants (other than Drouillard), sometimes after consulting with workers compensation defense attorney Stephen Kinsley.  Mr. Kinsley was hired by one or more defendants (other than Dr. Drouillard).  The decisions to pay or deny benefits and to hire Dr. Drouillard as examiner were made or ratified by one or more defendants (other than Drouillard) in consultation with their workers compensation defense attorney; the identity of the decision makers is in exclusive possession of defendants other than Drouillard.  These allegations are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.   All Notices of Dispute (NODs) mentioned in this complaint were mailed via the US mails to the injured worker and to the State of Michigan Workers Compensation Agency ("the Agency").

9.    **The Injury and Medical Care and Examinations for the Injury**.   Jay Brown was employed by defendants as a laborer since May 2004, doing heavy manual labor such as shoveling

3

asphalt and raking asphalt. He had no shoulder problem doing this until 7/19/2005, when he hurt his left shoulder, tearing the rotator cuff, while employed by Ajax, when with his left hand he grabbed a heavy water jug as it was falling. Later that day plaintiff fell on his left shoulder. He reported the left shoulder injury immediately to his employer. Ajax supervisors Quick and Landino made an Incident Report that day, detailing both incidents, and adding that plaintiff had had shoulder pain and right arm (not left arm) pain in the past.

(A) Plaintiff initially treated at Concentra Medical Center, Ajax's industrial clinic. Concentra sent plaintiff for an MRI of the left shoulder on 8/3/05, which reported, "full thickness tear" in the supraspinatus tendon and concluded "complete rupture of the rotator cuff." Activity was modified to no use of left arm.

(B) On 8/5/05, Glen Moore, MD, saw plaintiff at Concentra, and took or confirmed a history of injury at work on 7/19/05, and confirmed rotator cuff tear.

(C) Mr. Brown may have allegedly tested positive for cocaine on or about 8/4/05.

(D) On 9/26/05, Dr. Paul Drouillard, a board-certified orthopedic surgeon, examined Mr. Brown. He also reviewed the MRI report and films of 8/3/05. He noted in his report of that date that plaintiff told him, "He relates his complaints to an incident of July 19, 2005 when a full five gallon water jug slipped and he grabbed it and felt immediate pain in the left shoulder." Dr. Drouillard's report diagnosed "Rotator cuff tear of the left shoulder with degenerative joint disease of the left acromioclavicular joint." *The report also stated, inter alia, that "based on his historical account, this does appear to be a work-related injury."* (Emphasis supplied.)

(E) Plaintiff's workers compensation case went to a hearing before Magistrate Victor McCoy

4

of the Michigan Workers Compensation Agency on October 13, 2006.  The following occurred at the time of the hearing:

(1)   Ajax plus one or more defendants (except Drouillard) tried to bribe Ajax employee David Garrison to lie and falsely state that Jay Brown told him he hurt his shoulder outside work; they offered Mr. Garrison an envelope filled with cash.   This attempted bribe may have been witnessed by defense attorney Stephen Kinsley.  Mr. Garrison refused the bribe.

(2)  Attorney Kinsley and one or more defendants persuaded Dr. Drouillard to testify at the hearing, in exchange for $4,800 ($960 per hour), that the injury was *not* work-related, despite Dr. Drouillard's 9/5/05 report in which he stated, after seeing the MRI films and report and after examining Mr. Brown, that *"based on his [Brown's] historical account, this does appear to be a work-related injury."*  He restricted Mr. Brown to lifting 20lbs, and not over the shoulder with the left arm.

(3) Dr. Drouillard testified under oath at the hearing that  "the appearance of those films does not suggest an acute [recent] injury.... It means if there was a fresh tear there should be hemorrhage visible on the MRI and none is."  (Transcript pg 219, 10/13/06)  He testified, after reviewing a videotape of plaintiff doing some lifting, that plaintiff could do all lifting except repetitive overhead lifting.  He testified a person could do those movements "if you have a strong deltoid that's well developed it can compensate for a rotator cuff tear and people can function at a fairly high level; I believe that's what's occurring with Mr. Brown." (Trans 220, 221)  Drouillard also testified,

".....this is most likely a chronic rotator cuff tear and that he had excellent strength

5

and function of his deltoid which compensated for it." (Trans 223).

(4) On cross examination, Dr. Drouillard defined chronic as pre-existing the 7/19/05 injury (Trans 226). He admitted that in his report of 9/05 he never reported Mr. Brown had an over-developed deltoid. (Trans 228)   Also:

> Q And are you telling the Court today after re-reviewing the MRI your opinion as changed and this now appears to be a chronic problem.
>
> A I think that's a more accurate description. .... There is a tear in the rotator cuff. I think that it is chronic in nature. There's no evidence of hemorrhage; there's no evidence of edema in the bone that one would except with an acute tear.
>
> *Q How come you didn't say that in 2005?*
>
> *A I don't know.*   (Trans 230)

Also:

> Q The job that Mr. Brown was performing was.... shoveling asphalt?
>
> A Correct.
>
> Q Shoveling asphalt included throwing that asphalt onto a dump truck. Picking it up with a shovel and flipping it up and throwing it onto a dump truck. With the torn rotator cuff that he has could he do that?
>
> A Probably.  (Trans 230).

(5) After cross examination concluded, the magistrate examined Dr. Drouillard concerning his change in testimony between 9/25/05, when he reviewed the MRI films and examined Mr. Brown, and the hearing on 10/13/06:

6

Q Did the films [MRI] change between then and now?

A No.

Q So what happened?

A I did a more critical review of them and there is not evidence of an acute tear.

Q So your first report did not include a critical review, is that your testimony?

A It was a careful review but not a critical review.

(6) Magistrate McCoy awarded benefits to plaintiff, finding the torn left rotator cuff was work-related.  He wrote in his opinion that Dr. Drouillard's 9/26/05 report concluded, "Based upon his historical account, this does appear to be a work-related injury," and then the magistrate added:

Dr. Drouillard testified at trial, however, and changed his opinion regarding whether the injury was work-related.  Dr. Drouillard explained his change of opinion as the result of his more *critical* review of the MRI films as well as a careful reading of the body of the MRI report.  He explained that Mr. Brown's shoulder condition is not acute because there is no evidence of hemorrhage or evidence of edema in the bone that one would expect with an acute tear.  Dr. Drouillard testified that hemorrhagic changes usually persist from 4-6 weeks *after* the specific trauma causing the tear. The date of the MRI was 8/3/05, about two weeks after the work related incident alleged on 7/19/05.  Dr. Drouillard also testified that the MRI shows proximal humeral head migration, a finding that does not occur unless there is a chronic tear of the rotator cuff.  Dr. Drouillard admitted that the text of the MRI

7

report does not contain the term *chronic.*  Dr. Drouillard therefore changed his previous opinion (9/25/06 report) and testified that the injury was not work-related.

Dr. Drouillard has made two different interpretations of the same MRI film. Dr. Drouillard indicates that this discrepancy is the difference between a careful review of the films and a *critical* review of the films. [Emphasis in the original]  ***I find it preposterous that an experienced board certified practitioner such as Dr. Drouillard would miss basic findings (hemorrhagic change and bone edema) which are apparently critical to determining the very nature of the injury (acute vs chronic) upon initial review of the MRI.*** [Emphasis added]  Dr. Drouillard's testimony is likewise unsupported by his 9/26/05 report in a number of other areas: there is no mention of proximal humeral head migration in his report, or on the MRI report; Dr. Drouillard does not indicate in his report that the tear is chronic, and the MRI report is likewise devoid of any such language.

I *do not* find Dr. Droullard's trial testimony to be credible. [emphasis by the magistrate]   [pages 25-26, Opinion signed Feb 14, 2007]

(7) Magistrate McCoy awarded plaintiff medical and wage loss benefits.  Defendants in the case appealed.

10.   **The Enterprise or Enterprises.**  The allegations in this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.   The predicate acts and violations of RICO alleged herein were committed by one or more of the following enterprises.

8

(1)  Dr. Paul Drouillard participated in the conduct and management of the RICO enterprise of the "independent medical examination" practice of Dr. Paul Drouillard, and or participated in the conduct of one of the following enterprises, and or conspired with an enterprise in violation of 18 USC 1962(d).

(2)  The workers compensation claims personnel at Ajax, AGIC, Ward North America, and Vericlaims, handling Michigan workers compensation claims and associating in fact, formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) claims in this case.   Because they worked together regularly in adjusting and handling workers compensation claims for Ajax's Michigan workers, they formed an organization.  Stephen Kinsley, a Michigan workers compensation defense attorney who represented defendants, may have been part of the enterprise or conspired with it or aided and abetted it.  Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud plaintiffs of their workers compensation benefits:

(3)  the workers compensation claims personnel at the corporate defendants who handled Michigan claims, plus Dr. Drouillard, associating in fact;

(4) the medical business and practice of Dr. Paul Drouillard, which treats patients and which also generates what Dr. Drouillard fraudulently call "independent medical examinations;' for years Dr. Drouillard, by means of this enterprise, has supplied hundreds or thousands of fraudulent IME reports to Coca Cola, Sedgwick Claims Mgt Services, UPS, Liberty Mutual, Ajax Paving, and to other Michigan employers and workers compensation insurers.

(5) workers compensation defense attorney Stephen Kinsley may be and may have been part

of any of the enterprises described above.

11.    Each enterprise was an organization which existed not only for the purpose of defrauding plaintiffs of their workers compensation benefits; the enterprise engaged in other activities, such as the administration of workers compensation claims and the examination of individuals claiming workers compensation and other benefits. Each enterprise has existed for many years, and in each enterprise different persons had different roles concerning the conduct of the enterprise, not limited to the commission of the fraudulent acts complained of herein.

12.    Two or more enterprises may have acted together to defraud one or more plaintiffs of their workers compensation benefits.

13.    One or more of these persons or entities committed mail fraud, wire fraud and or conspiracy to defraud, in a repeated and continuing pattern extending over years applicable to plaintiffs and other MI employees of Ajax, by fraudulently terminating or denying benefits, by writing fraudulent medical reports and giving fraudulent deposition testimony, by hiring a doctor such as Paul Drouillard whom defendants knew would frequently give false testimony and or write false medical reports, by failing to honestly and in good faith review a claim as required by Michigan statute before denying the claim, and or by fraudulently terminating benefits. Defendants used the mails and wires in furtherance of this scheme, by mailing, emailing and or faxing Notices of Dispute and other communications.

14.    AGIC, Ward North America and other defendants (other than Drouililard) fraudulently violated duties owed plaintiff under the Michigan Uniform Trade Practices Act, MCL 500.2001 et seq, (MUTPA) using the mails and wires in furtherance of their scheme, in violation of 18 U.S.C.

10

1341 and 1343.   MUTPA applies to workers compensation insurance; see MCL 500.2008 and

500.2016.  The duties imposed on defendants in the administration of workers compensation claims

by the provision of that act required defendants to weigh in good faith the report of a doctor they

hired to examine a claimant against the reports and records of a claimant's treating doctors,  and all

other medical records, where the treating doctor found a work-related disability.  The provisions of

that act which apply to this action are:

a.  MCL 500.2006 Timely payment of claims or interest.   This section imposes a

duty to pay "on a timely basis" to "an individual ...directly entitled to benefits under

its insured's contract of insurance..."   "Failure to pay claims on a timely basis... is

an unfair trade practice unless the claim is reasonably in dispute."  The "reasonably

in dispute" language imposed a duty on Sedgwick and Coke (as self insurer) to

weigh in good faith the report of a doctor they hired to examine a claimant against

the reports and records of a claimant's treating doctors, and all other medical records,

where the treating doctor found a work-related disability.  This section also provides

that if benefits are not paid on a timely basis the benefits shall bear simple interest

after satisfactory proof of loss was received by the insurer at the rate of 12% per

annum.

b.  MCL 500.2026 Course of Conduct.  "[U]nfair or deceptive acts or practices in the

business of insurance, other than isolated incidents, are a course of conduct

indicating a persistent tendency to engage in that type of conduct and include:

"(d) Refusing to pay claims without conducting a reasonable investigation based

11

upon the available information.

***

(f) Failing to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

c. MCL 500.2062 False Reports.  "(1) It shall be unlawful; for any person in any report required by law to be made by any insurance corporation.... to make any such statement or report as to fraudulently conceal the real facts."

The Michigan legislature intended these sections of MUTPA to apply to the administration of workers compensation claims because when the legislature wanted a section *not* to apply to workers compensation, it said so; see MCL 500.2006(6).

15.  Defendants owed plaintiff a duty of *prompt* payment of claims not only under MUTPA, but under the Workers Disability Compensation Act.   This duty was stressed by the Michigan Supreme Court said in *McAvoy v H. B. Sherman Co.* 401 Mich 419, 258 NW2d 414 (1977):

Any worker's compensation schema has, therefore, as its primary goal, the delivery of sustaining benefits to a disabled employee as soon as possible after an injury occurs, regardless of any traditional concepts of tort liability.  The objective of the social legislation is to provide the disabled worker with benefits *during* the period of his disability so that the workers and his dependents may survive (literally) the catastrophe which the temporary cessation of necessary income occasions..  [emphasis by the Court]

16.   In doing IMEs and in giving related depositions, in this case and other cases such as Clifton E. Jackson, et al, v Sedgwick Claims Management Services, et al, USDC Eastern District

12

of MI, Case No.: 2009-11529, and Sammy Lewis, et al, v UPS, et al, USDC Eastern District of MI, Case No. 2:09-cv-11059, Dr. Drouillard violated duties arising under his medical licenses, oaths and standards, under the WDCA, under the federal mail and wire fraud statutes, 18 USC 1341 and 1343, and under Michigan common law, requiring him to:

    a.  be unbiased and honest;

    b.  be independent in his judgment; that is, not favor either a workers compensation claimant or the insurance adjuster, insurer or self-insurer for whom he did the IME;

    c.  determine in an IME the issues of disability and of the work-relatedness of an injury in the same manner as he would for a patient he was treating;

    d.  fairly, accurately and honestly examine a claimant;

    e.  accurately and honestly report what he did during an examination;

    f.  completely and honestly record any history given to him by an examinee;

    g.  weigh the results of his examination against the reports and records he possessed from other physicians who had examined or treated the claimant;

    h.  testify honestly;

    i.  not to engage in a scheme to defraud workers compensation claimants, with use of the mails or wires in furtherance of that scheme.

    17.  Dr. Drouillard committed fraud for various employers, workers compensation insurers, self insurers, and TPAs, by writing dozens of reports over a period of years (1) stating he examined a claimant or a body part of a claimant when he did not; (2) stating a claimant said something to him which the claimant did not say; (3) stating a claimant failed to disclose a fact which the claimant did

13

disclose, and or (4) stating dishonestly and without reasonable medical basis that a claimant did not have a work-related disability.  Dr.  Drouillard was engaged in the business of writing such reports on behalf of MES Solutions, Medical Evaluation Specialists, and other companies which contract with physicians to do forensic medical examinations; he wrote fraudulent reports and gave fraudulent testimony on behalf of other employers, claim adjusting companies and insurers besides Coke, Sedgwick, DHL, SRS Services, Ajax Paving, UPS and Liberty Mutual ; in 2004-2008 he earned about $600,000 per year doing   exams of workers compensation and other insurance claimants, writing reports of the exams, and testifying in cases arising out of those exams.

18.     A.  Defendants' fraud was also accomplished in part by the termination of benefits for stated reasons which were a  mere pretext rather than a legitimate basis for denial of benefits.


B.  Plaintiffs' damages were proximately caused by defendants' scheme of fraudulently and dishonestly denying workers compensation benefits.  Mail and electronic communications were used by defendants in furtherance of the scheme.  Defendants' use of mail and electronic communications in furtherance of their scheme of fraud violated 18 U.S.C. 1341 and 1343.

C.  On information and belief, some of the acts of mail and wire fraud consisted of communications between defendants, or between defendants and the IME "cut off" doctors whose reports defendants relied upon in terminating or denying plaintiffs' benefits, or between defendants and their workers compensation defense attorneys; plaintiffs do not have these communications. On information and belief, the defendants (other than Drouillard) relied on their Michigan workers compensation defense attorneys to identify "cut off: doctors - that is, doctors whom the attorneys

14

knew could be relied upon with extreme confidence to write a report stating a claimant did not have a work-related disability, which the insurer or the claim adjuster or the defense attorneys could then cite as grounds for cutting off or denying workers compensation benefits; those attorneys communicated by mail and wire with defendants concerning the tactic of using doctors who could be relied on to write a report that would state a worker did not have a work-related disability regardless of the facts, and the attorneys gave to defendants the name and contact information for such doctors, such as Dr. Paul Drouillard. These attorneys recommended Dr. Drouillard as a cut off doctor to their other clients.   In their communications, defendants and perhaps their attorneys discussed means - such as using cut off doctors like Dr. Drouillard - of cutting off plaintiffs' benefits or forcing them to take settlements at less than true value, even though defendants and their workers compensation defense attorneys possessed medical reports from treating doctors and doctors chosen by defendants stating plaintiffs did have work-related disabilities. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

19. Dr. Drouillard has repeatedly testified in workers compensation cases that "independent medical examinations" (IMEs) and related depositions are "10 to 15% of my practice," but he knew that testimony was false because IMEs and related depositions either comprised substantially more than 10 to 15% of his earnings or substantially more than 10 to 15% of the time he spent in his practice (earning money from the practice of medicine and doing IMEs and depositions). From 2003 through 2008 he did about 1,100 examinations per year.

20.     Defendants' fraudulent scheme was accomplished by use of the United States mails

15

and by electronic communications in violation of 18 U.S.C. 1341 and 1343.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

21.   Dr. Paul Drouillard, as part of a RICO enterprise or by his association with or employment by one of the RICO enterprises alleged above, violated 18 U.S.C. 1962(c) in that he participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, and proximately injured plaintiffs as alleged herein.   His illegal conduct is described in throughout this complaint.   The Michigan workers compensation defense attorney, Stephen Kinsley, through his action described in this complaint, may have participated in the conduct of the enterprise's affairs through a pattern of racketeering activity which proximately injured plaintiff as alleged herein., and including subornation of perjury and recommending or ratifying false and fraudulent statements or false defenses to Jay Brown's claim.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

22.   Defendants, not as the RICO enterprise but by association with one of the RICO enterprises alleged above, violated 18U.S.C. 1962(c) in that they participated in the conduct of a RICO enterprise's affairs through a pattern of racketeering which proximately injured plaintiffs, making those defendants liable to plaintiffs for damages.  The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

23.   Defense attorney Stephen Kinsley, as agent for the other defendants except Drouillard, and or in conspiracy with them or aiding and abetting them, may have participated in the scheme

16

by using the mails and wires to procure perjured testimony by Dr. Drouillard, and to present defenses to Mr. Brown's claim which Mr. Kinsley knew to be false, and by advising defendants (other than Drouillard) to defend and delay the claim despite knowledge that there was no reasonable ground for defense and delay of Mr. Brown's claim. The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

24. Defendants other than Drouillard are liable to plaintiffs under respondent superior and vicarious liability insofar as they have profited or benefitted from their employees' or agents' violations of 18 U.S.C. 1962(c) or 1962(d).

25. **Continuity.** The racketeering described in this complaint continued over a period of at least 4 years, starting in July 2005 and continuing to at least August 2009, and involved workers compensation claimants in addition to Jay Brown; the racketeering was a regular and continuing method which defendants used to handle many workers compensation claims, and defendants' behavior involves a systematic threat of ongoing fraud and a high risk of continuing fraud.

A. For example, in or about 2005 and 2006, Ajax, perhaps with the assistance of other defendants (other than Dr. Drouillard), fraudulently denied the workers compensation claim of Michigan Ajax employee Richard (Rick) Strauss. Ajax foreman Jerry Quick laughingly told Jay Brown "they fucked" Mr. Strauss "out of" his workers compensation; this occurred after Mr. Strauss had his leg crushed at work on a front end loader. Mr. Quick bragged to Mr. Brown that Ajax fired him after the injury.

B. Dr. Drouillard has committed dozens if not hundreds or thousands of acts of fraud by

17

writing fraudulent IMEs and giving fraudulent testimony in workers compensation cases over the last 10 years, as detailed elsewhere in this complaint and in the civil RICO complaints of Clifton E. Jackson, et al, v Sedgwick Claims Management Services, et al, USDC Eastern District of MI, Case No.: 2009-11529, and Sammy Lewis, et al, v UPS, et al, USDC Eastern District of MI, Case No. 2:09-cv-11059.

C.   Dr. Douillard also did at least 10 IMEs on employees of UPS in the last 5 years, many of which were fraudulent, as alleged in *Sammy Lewis, et al Dr. Paul Drouillard, et al*, USDC ED MI, case 09-CV-11095 (Hon. Robert Cleland).  Dr. Drouillard made these examinations as part of his scheme of racketeering, in which  at least 20 times in the last 5 years he wrote and mailed false IME reports for the named individuals.   These fraudulent reports were part of the pattern of racketeering by Dr. Drouillard, by which he wrote and conspired to write fraudulent IME reports for various workers compensation insurers, claims adjusters and defense lawyers.  These fraudulent reports and particular acts of fraud include these examples of predicate acts:

(1) A report by Dr. Drouillard on UPS employee Shawne Henry, which he mailed to Liberty Mutual In Indianapolis IN, from Garden City or Westland MI, on January 24, 2007, in which he fraudulently described the exam that he did and fraudulently concluded plaintiff had no work-related disability.

(2 ) A report by Dr. Drouillard concerning Christine Singleton, a UPS employee, which he mailed Dec. 28, 2007, from his Westland or Garden City office to Liberty Mutual in Indianapolis IN, as part of a scheme to fraudulently deprive Mrs. Singleton of her workers compensation benefits, in which he fraudulently described the exam

18

that he did and fraudulently concluded plaintiff had no work-related disability.

(3)  A report by Dr. Drouillard concerning John Miller, a UPS employee, which he mailed Oct. 14, 2005, from his Westland or Garden City office to Liberty Mutual in Indianapolis IN, as part of a scheme to fraudulently deprive Mr. Miller of his workers compensation benefits, in which he fraudulently described the exam that he did and fraudulently concluded plaintiff had no work-related disability.

The allegations of this paragraph are based on the allegations in all other paragraphs of this complaint, and on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery of other workers compensation claims by other Ajax employees.

26. **Conspiracy (18 U.S.C. 1962(d)).**  By means of the actions described in the complaint, each of the defendants conspired to violate 18 U.S.C. 1962( a through c), and conspired with one or more of the other defendants, and or the employees of defendants, and or with other persons, to violate 18 U.S.C. 1962(a through c).  Defendants, through the actions of their employees and agents, including their attorneys, involved in the handling of Michigan workers compensation claims, and Dr. Drouillard, agreed to participate in the commission of the predicate acts which are alleged in this complaint.  The identities of the employees of defendants and the dates of their actions and the dates they learned of the planned predicate acts are not known to plaintiff.   These allegations are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  Such actions of conspiracy proximately caused or contributed to plaintiffs' damages, as a result of which defendants are liable to plaintiff under section

19

1962(d).

27. **Aiding and Abetting.**   Each of the defendants (other than Drouillard) aided and abetted the predicate acts committed by the other defendants.   On information and belief, each knew of the predicate acts planned by the other defendants and permitted them to take place by silent or express approval, and by failing to stop the pattern of racketeering though it had knowledge of same.   Ajax, Ward and ACIG, through the actions of their employees involved in the handling of Michigan workers compensation claims, agreed to participate in the commission of the predicate acts which are alleged in this complaint.   The identities of the employees of defendants and the dates of their actions and the dates they learned of the planned predicate acts are not known to plaintiff.   The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

28. **The Pattern of Racketeering.**

(A)   The pattern of racketeering and some of the particular means of achieving this fraudulent scheme which are known to plaintiffs at this time are described below plaintiff by plaintiff (paras. A and B).   These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery; for example, precise dates of mailing or faxing or emailing among defendants or their agents are known to defendants and not plaintiffs.   These allegations describe a pattern of racketeering spread over several years, continuing in the present and likely to continue into the future.   Defendants used mail and electronic communications in furtherance of their scheme to defraud,  violating 18 USC 1341 and 1343.   The dates of some of these mailed, emailed or faxed communications are within the

possession of defendants.

(B)  Workers compensation attorney Stephen Kinsley may have participated in the scheme by using the mails and wires to (1) to advise defendants (other than Drouillard) to defend and delay the claim despite knowledge that Mr. Brown had presented proof of a valid workers compensation claim and that there was no reasonable ground for further defense and delay of the claim, and (3) by suborning or trying to suborn perjured testimony from Dr. Drouililard and David Garrison.  The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(C) Defendants other than Dr. Drouillard committed at least the following predicate acts of mail and or wire fraud.   The allegations of this paragraph are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(1) On 9/6/2005, Patrick Haley, on behalf of ACIG, Ajax and Ward North America, mailed from Wyandotte MI to Jay Brown in Sterling Hgts MI and to the Michigan Workers' Compensation Agency (the "Agency") a Notice of Dispute which fraudulently denied benefits, fraudulently giving as grounds "employee withdrew himself from the job market."

(2)  On 9/9/2005, attorney Daniel Peterson, on behalf of defendants (other than Drouillard) mailed from Southfield MI to the Agency and to Mr. Brown or his lawyer ANSWER AND AFFIRMATIVE DEFENSES which fraudulently stated that "plaintiff suffered no personal injury.... which arose out of and in the course of employment with defendant company." This statement was fraudulent because Mr. Peterson and the other defendants (other than

21

Drouillard) possessed information that Mr. Brown did sustain a shoulder injury arising out of and in the course of employment with Ajax.

(3) On 9/15/05, Patrick Haley of Ward North America LP mailed from Wyandotte MI to Mr. Brown in MI a letter directing Mr. Brown to appear for "an Independent Medical Examination" with Dr.Drouillard; this letter was used in furtherance of the fraudulent scheme of denial of benefits, and was further fraudulent in that it described Dr. Drouillard as "Independent" when Mr. Haley knew Dr. Drouillard favored insurance companies, employers and TPAs.

(4)   Defendants, through their attorneys and their employees such as Patrick Haley (Ward North America) and Joseph Landino (Ajax), committed between Feb. 1, 2006 and August l, 2009, dozens of predicate acts of mailing, emailing, telephoning and faxing in furtherance of the scheme.   The dates and contents of these communications are in the sole possession of defendants (except Dr. Drouillard), except as indicated below, inter alia:

(a)    On June 19, 2006, Kenneth Jones, attorney for defendants (except Drouillard) mailed to the Workers Compensation Appellate Commission in Lansing MI, to Ron Gricius (plaintiff's attorney) in Mt Clemens MI, to Patrick Haley of Ward in Wyandotte MI, and to Joseph Landino of Ajax in Troy, MI,, a letter in furtherance of the scheme.

(b) On 1/31/06, Mr. Peterson, attorney for defendants except Drouillard, faxed a document in furtherance of the scheme to defraud.

(c) On or about June 19, 2006, employees and agents of Ajax, including their

workers compensation defense attorneys, made telephone calls, sent faxes and wrote letters to each other, and to Mr. Gricius (attorney for plaintiff) in furtherance of the scheme to defraud, whereby defendants (excluding Drouillard) stated they would try to nullify a Voluntary Payment agreement (VP) defendants had signed under which defendants would pay wage loss benefits and medical care for plaintiff's rotator cuff tear; defendants (except Drouillard) sought to nullify the VP because they claimed plaintiff was working at the time the VP was signed. Even if the claim was true, that would not affect legally defendants' obligation to pay for medical care, or for wage loss benefits accruing before plaintiff found post-injury employment.

(d) In Sept. 2006, Stephen Kinsley (attorney and agent for defendants other than Drouillard) and Dr. Drouillard telephoned and or faxed and or emailed each other at least twice (committing two predicate acts of mail and or wire fraud), on dates which are in the exclusive possession of these persons, to arrange the testimony of Dr. Drouillard at the hearing and to discuss Dr. Drouillard's fraudulent change of opinions from his report.

(e) Dr. Drouillard billed defendants and or Mr. Kinsley for the trial testimony, sending the bill by mail or fax or email, and defendants paid that bill by a check sent through the mail; these predicate acts occurred on dates unknown to plaintiff and in the exclusive possession of defendants; these were predicate acts of mail or wire fraud in violation of 18 USC 1341 and 1343, because they were acts in furtherance of the scheme to defraud plaintiff of his workers compensation benefits..

23

(D) The facts pertaining to other predicate acts of mail or wire fraud by defendants are in the exclusive possession of defendants.   Plaintiff avers that there are dozens of letters, emails, phone calls, text message and faxes among or between the defendants made in furtherance of the scheme to defraud him of his workers compensation benefits in the four years between July 2005 and Sept. 2009, because defendants, as insurers and or as TPAs or as employer (other than Drouillard) must have reported developments to each other, billed each other, questioned each other, negotiated with each other, discussed the VP agreement, planned strategy or tactics with each other, and prepared or discussed appeals, these 50 months.

29.   **Damages.**   Defendants' fraud caused financial loss to plaintiff: loss of workers compensation benefits, time value in the delayed receipt of benefits, loss of payment for medical bills, drugs, attendant care, and mileage, attorney fees paid to recover workers compensation benefits.

30.   **PRAYER FOR RELIEF .**   WHEREFORE plaintiffs pray for judgment against defendants jointly and severally in an amount exceeding $75,000, plus interest, costs and attorney fees under the RICO act or any other applicable federal statute or court rule, and injunctive relief as described belowe.

31.   **PRAYER FOR INJUNCTIVE RELIEF.**  Plaintiffs seek equitable relief.  They seek an injunction (1) forbidding Dr. Drouillard from doing medical examinations in workers compensation cases; IMEs for Coke and Sedgwick; (2) forbidding defendants from using a doctor for workers compensation medical examinations who in the overwhelming number of exams does not find a work-related injury; (3) requiring defendants other than Drouillard to keep detailed and

24

public records of all deliberations and communications regarding every decision (a) to pay or deny workers compensation benefits, and (b) to select a doctor for an examination of a MI workers compensation claimant, and (4) requiring defendants other than Drouillard to adjust and handle claims as required by the Michigan Insurance Code and the Workers Disability Compensation Act.

## REQUEST FOR CLASS CERTIFICATION

1.   The class of plaintiffs involved in this action are so numerous that joinder of all members is impracticable; on information and belief, the number exceeds fifty.

2.   A question of law and fact exists common to the class, namely whether defendants conducted or associated with a RICO enterprise with the aim of fraudulently denying MI workers compensation claimants their benefits.

3.   The claims of the plaintiffs are typical of the claims and defenses of the class.

4.    The plaintiffs and their counsel will fairly and adequately protect the interests of the class.

5.   Prosecuting separate actions by individual class members creates a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the parties opposing the class.

6.   Defendants have acted on grounds that generally apply to the class, so that injunctive relief is appropriate respecting the class as a whole.

WHEREFORE plaintiffs pray for certification of this action as a class action.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues triable by jury.

25

/s/ Marshall Lasser
Marshall Lasser PC, by
Marshall Lasser P25573
po box 2579
Southfield MI 48307
(248) 647 7722
mlasserlaw@aol.com
ddtalon@gmail.com

Dated: January 12, 2010

C:\wp51\DOCS\BrownJay\RICOSuit\Complaint.wpd